UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,                       :

        -against-                              :      **MEMORANDUM AND ORDER**
                                         :      12-CR-198 (WFK)

ION CATALIN VRANCEA,                            :
aka Raul Caba, aka Iulian Ichim,                :
aka Imre Makara,                                :

                              Defendant.    :
-------------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge:**

      Following a jury trial, Defendant Ion Catalin Vrancea ("Defendant") was found guilty of
(1) Obstruction of Justice, (2) Destruction of Evidence, (3) Use of Arson to Commit Obstruction
of Justice and/or Destruction of Evidence, (4) Use of Fire to Damage Real and Personal
Property, and (5) Use of False Passport on January 15, 2013. Dkt. 63 ("Jury Verdict"). On
November 6, 2013, the Court sentenced Defendant to a term of three hundred and sixty months
imprisonment to be followed by three years supervised release, and ordered Defendant to pay
$67,361.42 in restitution and the $500.00 mandatory assessment fee. Dkt. 71 ("Sentencing
Minute Entry"). Defendant appealed his conviction and sentence. Dkt. 74 ("Notice of Appeal").
On July 10, 2015, the Second Circuit affirmed Defendant's conviction and remanded
Defendant's case for resentencing proceedings with instructions to discuss the 18 U.S.C. §
3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2). *United States v. Vrancea*, 13-4519, slip op.
at 3-4 (2d Cir. July 10, 2015). The Court now provides a complete statement of reasons related
to the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2). For the reasons discussed
below, Defendant is hereby sentenced to one hundred and eighty months imprisonment, to be
followed by three years supervised release, and ordered to pay $67,361.42 in restitution and the
$500.00 mandatory assessment fee.

## BACKGROUND

      On February 15, 2012, a Sealed Complaint was filed against Defendant detailing his

extensive participation in "an organized criminal group that employs electronic 'skimming'

devices to steal credit- and debit-card information from unsuspecting victims in Europe, uses that

information to withdraw cash from banks in the United States, and then wires the stolen funds

back to co-conspirators overseas." Dkt. 1 ("Compl.") at ¶ 5. That same day, Magistrate Judge

1

Orenstein of the Eastern District of New York signed an arrest warrant for Defendant. Dkt. 2 ("Arrest Warrant").

On February 16, 2012, agents from the Federal Bureau of Investigations ("FBI") attempted to execute the arrest warrant at Defendant's residence, 31-76 37th Street, Apartment 2B, an apartment located on the second floor of a five-story, 21-apartment building in Astoria, Queens. Dkt. 15 ("Opp. to Bail") at 2; Dkt. 9 ("Indictment"); Dkt. 77-4 ("Tr. IV") at 78. Defendant refused to answer the door. Opp. to Bail at 2. FBI agents then heard a loud noise coming from the apartment, saw and smelled smoke, and observed Defendant opening a rear window. *Id.* FBI Agents, assisted by the New York City Fire Department ("FDNY"), gained entry to the apartment. *Id.* Defendant was arrested and removed from the apartment, along with his girlfriend. Dkt. 65 ("PSR") at ¶ 24; Dkt. 77-1 ("Tr. I") at 49. FBI agents subsequently discovered a cell phone, laptop, and other electronic equipment in Defendant's apartment that had been tampered with using, in some cases, fire. Opp. to Bail at 2-3.

On December 20, 2012, Defendant was charged by a Second Superseding Indictment with (1) Obstruction of Justice under 18 U.S.C. §§ 1512(c)(1), 2 and 3551 *et seq.* ("Count One"); (2) Destruction of Evidence under18 U.S.C. §§ 1519, 2 and 3551 *et seq.* ("Count Two"); (3) Use of Arson to Commit Obstruction of Justice under 18 U.S.C. §§ 844(h)(1), 2 and 3551 *et seq.* ("Count Three"); (4) Use of Fire to Damage Real and Personal Property under 18 U.S.C. §§ 844(i), 2 and 3551 *et seq.* ("Count Four"); and (5) Use of False Passport under 18 U.S.C. §§ 1543 and 3551 *et seq.* ("Count Five"). Dkt. 40 ("Second Sup. Indictment") at 1-4.

On January 7, 2013, Defendant's jury trial commenced. Dkt. Entry dated 01/07/2013. During the five-day trial, the Government presented the following witnesses: Special Agent Stacy E. Nimmo; Special Agent Matthew Nahas; Special Agent Sara Poole; Special Agent Judith

Cutler; Forensic Examiner Susannah Kehl; Special Agent William Murray; United States Secret Service Agent Christian Wilson; Forensic Examiner Dyanne Carpenter; Special Agent Martha Berdote; Forensic Examiner Jason Abramowitz; FDNY Fire Marshal Michael Janowski; Customs and Border Patrol Officer Timothy Gonzalez; Lena Rommayamantakit; Chris Biancaniello; Supervisory Special Agent John Bivona; Special Agent Jeff Montanari; Peg Peterson; Willard Hart; Joselito Jimbo; Thomas Lopez; and Elio Angulo. Dkt. Entries dated 01/07/2013, 01/08/2013, 01/09/2013, 01/10/2013, 01/11/2013. The Defense called only one witness, the Defendant. Dkt. Entry dated 01/11/2013. On January 14, 2013, the jury began deliberations. Dkt. Entry dated 01/14/2013.

On January 15, 2013, the jury unanimously found Defendant guilty of Counts One (Obstruction of Justice), Two (Destruction of Evidence), Three (Use of Arson to Commit Obstruction of Justice and/or Destruction of Evidence), Four (Use of Fire to Damage Real and Personal Property), and Five (Use of False Passport) of the Second Superseding Indictment. Dkt. Entry dated 01/15/2013; Jury Verdict; Dkt. 79 ("Tr. VI") at 45-49.

On November 6, 2013, Defendant was sentenced to a term of three hundred and sixty months imprisonment to be followed by three years supervised release, and ordered to pay $67,361.42 in restitution and the $500.00 mandatory assessment fee. Sentencing Minute Entry; Dkt. 72 ("Judgment"); Dkt. 73 ("Statement of Reasons").

On November 27, 2013, Defendant filed a notice of appeal of his conviction and sentence with the Second Circuit Court of Appeals. *See* Notice of Appeal.

On July 10, 2015, the Second Circuit affirmed Defendant's conviction and remanded Defendant's case with instructions to conduct resentencing proceedings. *United States v. Vrancea*, 13-4519 (2d Cir. July 10, 2015). Specifically, the Second Circuit noted the District

Court had failed to "adequately explain its sentence" in failing to explain its departure from the recommended sentencing range under 18 U.S.C. § 3553(c)(2) and in failing to "discuss any of the Section 3553(a) factors[.]" *Id.* at 3-4.

For the reasons set forth directly below, the Court resentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the Section 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

### I.     Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case. When the District Court chooses to impose a sentence outside of the Sentencing Guidelines range, 18 U.S.C. § 3553(c)(2) mandates the Court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The Court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form[.]" *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under [Section] 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal quotation marks and citation omitted). 18 U.S.C. § 3553(a) provides a list of reasons for the Court to consider in choosing what sentence to impose on a criminal defendant. Specifically, Section 3553(a) states "[t]he court, in determining the particular sentence to be imposed, shall consider[;]"

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

The Court will address each of the 18 U.S.C. § 3553(a) factors in turn.

## II.   Analysis

### 1.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first 18 U.S.C. § 3553(a) factor requires the Court to evaluate "the nature and

circumstances of the offense and the history and characteristics of the [D]efendant." 18 U.S.C. §

3553(a)(1). Proceeding chronologically, the Court will address first the history and characteristics of the Defendant and then the nature and circumstances of the offense. Based on the nature and circumstances of the offense, and the Defendant's history and characteristics, a significant sentence is justified.

### a. History and Characteristics of Defendant

Defendant was born on August 25, 1980 in Craiova, Romania. PSR at 2; Dkt. 77-5 ("Tr. V") at 487-88. He is a Romanian national. Compl. at ¶ 6; Dkt. 13 ("Bail Letter") at 1. Defendant was raised under impoverished economic circumstances, but reports no history of abuse and shares a close relationship with both his parents and his sister. PSR at ¶¶ 73-74. Although the Defendant alleges he received a Bachelor of Arts degree in economics from University Nitiai Viteazu in Craiova, Romania, the Government argued at trial that he in fact received a degree in electrical engineering, rather than economics. PSR at ¶ 83; Tr. V at 488; 551-552. On November 23, 2009, Defendant was issued a B1/B2 tourist visa to enter the United States under Defendant's real name and nationality. PSR at ¶ 10. However, there is no evidence Defendant used this visa to enter the United States during its period of validity. Defendant's history is littered with repeated instances of criminality, including evidence of his involvement in an extensive international network of cyber criminals. Defendant has also shown a propensity for lying about his identity and for using false identity documents. Moreover, Defendant has also repeatedly disregarded the laws of several countries.

For example, Defendant's criminal exploits are international in nature and span many years. He has used at least three aliases at various times, including Iulian Ichim, Imre Makara, and Raul Caba. PSR at 2. At the time Defendant was charged in this case, Romanian law enforcement authorities had been engaged for some time in an "investigation of a fraud scheme

6

involving an organized criminal group[, including Defendant,] that employs electronic 'skimming' devices to steal credit and debit card information from unsuspecting victims in Europe, uses that information to withdraw cash from banks in the United States, and then wires the stolen funds back to co-conspirators overseas." Opp. to Bail at 3; *see also* PSR at ¶ 7.

In December 2010, Defendant was charged in Milan, Italy with "involvement in a conspiracy to commit credit card fraud." PSR at ¶ 9; Compl. at ¶ 7; Opp. to Bail at 3; *see also* Tr. V at 488-89. Italian law enforcement authorities also advised the FBI that Defendant, along with six co-conspirators, planned to enter the United States and Mexico to begin operations in North America. PSR at ¶ 9; Compl. at ¶ 7; Opp. to Bail at 3.

On July 13, 2010, an Interpol warrant was issued for Defendant's arrest stemming from the Romanian investigation and charging him with "criminal association, counterfeiting of payment instruments, and placing counterfeited payment instructions into circulation." PSR at ¶ 8; Compl. at ¶ 6.

On January 25, 2011, a second Interpol arrest warrant was issued for Defendant based on the charges in Italy. PSR at ¶ 9; Compl. at ¶ 6. Defendant was subsequently convicted of the charges in Milan, Italy in absentia, though Defendant testified that he had no knowledge of the charges and had filed an appeal. Tr. V at 490.

On March 1, 2011, Customs and Border Protection ("CBP") agents detained Defendant and eight other individuals as they attempted to enter the United States without inspection near Hidalgo, Texas. PSR at ¶ 11. Defendant testified that he came to the United States seeking political asylum because he had been accused of a crime in Romania, which he acknowledged on cross-examination was "basically the same case" as the fraud charges in Italy, although Defendant had previously testified on direct examinations he never knew about the charges in

Italy. Tr. V at 491, 591-94, 596. CBP Agent Timothy Gonzalez testified Defendant gave his name as Iulian Ichim and birthdate as March 6, 1984 during an interview on March 2, 2011 at the border. Tr. IV at 50, 52. Agent Gonzalez stated Defendant later changed his answers to provide his real name of Ion Catalin Vrancea and real birthday of August 25, 1980. Tr. IV at 53. Defendant explained he had traveled from Romania to Hungary by bus, then from Hungary to France on the same bus, then to England by ferry, then to Mexico City, Mexico by airplane, where he stayed for ten days, and then to Reynosa, Mexico where he stayed for a day before entering the United States on March 1, 2011. Tr. IV at 54; Tr. V at 491. Agent Gonzalez took a Romanian identification card from Defendant in the name Iulian Ichim; Defendant admitted to Agent Gonzalez that the identity document was false. Tr. IV at 55-56.

Defendant was subsequently released from custody at the border in Texas but was scheduled to appear at the CBP Los Angeles Field Office on April 14, 2011 and again on November 10, 2011 for a removal hearing. PSR at ¶ 11. Defendant failed to appear on either date; accordingly, his visa was revoked and an order of removal was issued on November 22, 2011. PSR at ¶ 11.

In October or November 2011, the FBI received information from law enforcement in Germany and Romania "regarding a group of individuals who were engaged in the theft of credit card and ATM or debut card information. They were then taking that information, bringing it to the United States or the numbers to the United States, where they were withdrawing funds at locations within the United States." Tr. IV at 103 (testimony of Supervisory Special Agent John Bivona). Perhaps as early as late 2011 but no later than January 19, 2012, the FBI began conducting surveillance on Defendant has part of their investigation into this international organized crime threat. Tr. I at 33-34; Tr. IV at 103-04. That surveillance ultimately led to an

arrest warrant being issued for Defendant and a search warrant being issued for Defendant's apartment on February 15, 2012. Tr. I at 37; Tr. IV at 106; *see also* Arrest Warrant.

On February 1, 2012, Defendant moved into Apartment 2B in 31-76 37th Street, Astoria, Queens, the apartment in which he committed the instant offenses. Tr. IV at 78, 86-87. Defendant signed the lease under the name Raul Caba and provided a passport under that name to the building's landlord, Chris Biancaniello. Tr. IV at 87-88. Mr. Biancaniello identified Defendant as the tenant of 2B, who he knew as Raul Caba. Tr. IV at 88-89.

Defendant's character was further diminished when he committed perjury during his trial in this matter. Dkt. 69 ("PSR Addendum") at 2. At trial, Defendant testified (1) he never successfully constructed a skimming device, (2) the fire started coincidentally at the moment the FBI agents knocked on his door, (3) the smashed electronics had been destroyed prior to the FBI agents' arrival when Defendant got into a fight with his girlfriend, and (4) he tried to open his front door for the FBI agents but was unable to do so because the door was smashed in. PSR Addendum at 2; Tr. V at 495-98, 506-09, 512, 516-18, 568-72, 574-75, 578-79. Ultimately, Defendant testified that he did not set a fire to destroy evidence and to obstruct justice because he could have done that easily after he noticed the FBI following him on January 19, 2012 rather than wait until the FBI was at his door. Tr. V at 600-01.

However, Defendant's testimony was contradicted by the credible testimony of numerous law enforcement agents. For example, Special Agent Stacy Nimmo testified Defendant never came to the door of his apartment after the agents announced their arrival. Tr. I at 61-65. Special Agent Nahas testified he "heard what [he] took to be a banging sound, something being smashed against something else, coming from inside of the apartment" after the agents announced their arrival, and he also testified he observed flickering fire light on the back wall of

the apartment complex through the living room window just after seeing a male figure walk through the living room. Dkt. 77-2 ("Tr. II") at 108-09. Special Agent Wilson testified, in his expert opinion, that (1) the material evidence found in Defendant's apartment consisted of complex skimming equipment, and (2) Defendant might have been manufacturing the skimming equipment for sale to others. Tr. III at 332-37, 341-45, 348-51, 353-55, 363-66. Defendant's testimony was also found wholly incredible by the jury, who convicted Defendant on all charges. PSR Addendum at 2.

In addition to lying under oath, Defendant also exhibited a troubling lack of respect for the United States Government. For example, when Assistant United States Attorney Amanda Hector cross-examined Defendant, Defendant was overly aggressive towards her and continuously had to be reminded by this Court that he needed to truthfully answer the questions directed at him. *See* Tr. V at 551-52, 554, 557-58.

Based on the above, it is clear that Defendant's extensive criminal nature and characteristics, in addition to his disregard and lack of respect for the American justice system and the laws of several countries, weigh in favor of a longer sentence.

### b. Nature and Circumstances of the Offense

The foundation of Defendant's criminal offenses was laid months before he was charged with anything. Between August and September 2011, Defendant transferred money to individuals in Italy, China, Germany, and Romania via Western Union, Money Gram, Super Cash, and Pay-O-Matic. PSR at ¶ 12-18; Tr. IV at 145-47, 149; Tr. V at 450, 457; Compl. at ¶ 13. On seven occasions, Defendant transferred money through Western Union using a passport with the name Iulian Ichim. Tr. IV at 131. Defendant also used a Romanian passport with the name Iulian Ichim and Defendant's photograph while transferring money through Super Cash

and through Pay-O-Matic. Tr. V at 457-58, 460, 470-72. On at least *thirty* other occasions, Defendant presented a Romanian passport in the name Raul Caba and bearing a photo of Defendant to transfer money through Western Union, MoneyGram, and Pay-O-Matic. PSR at ¶ 12; Tr. IV at 133-34 (discussing seven transactions through Western Union under the name Raul Caba); Tr. IV at 145-47, 152 (discussing nineteen transactions through MoneyGram under the name Raul Caba); Tr. V at 473-79 (discussing four transactions through Pay-O-Matic under the name Raul Caba); Compl. at ¶ 13.

In January 2012, Romanian law enforcement authorities intercepted a package addressed to one Iulian Ichim at an address in New York which contained a counterfeit Hungarian passport and driver's license in the name Makara Imre and bearing photos of Defendant. PSR at ¶ 19; Compl. at ¶ 10. The counterfeit identity documents were hidden inside a digital picture frame. PSR at ¶ 21; Opp. to Bail at 2. The P.O. Box to which the intercepted package was addressed was rented by Defendant using a Romanian passport bearing the false name Iulian Ichim. PSR at ¶ 20; *see also* Tr. IV at 63 (Testimony of Lena Rommayamantakit, Manager of the UPS store in Sunnyside, Queens). After intercepting the package, the Romanian authorities sent the package to New York and alerted the FBI. On January 23, 2012, the FBI obtained a warrant to remove and search the package addressed to Iulian Ichim. Tr. IV at 110, 114. Inside the package, FBI agents discovered a digital picture frame and, hidden inside the picture frame, a passport and a driver's license in the name of Makara Imre. Tr. IV at 116-121. The FBI agents then re-constructed the package and returned it to the P.O. Box rented by Defendant. Tr. IV at 123.

Based on the following sequence of events, a Sealed Complaint was filed against Defendant in February 2012 detailing his participation in "an organized criminal group that employs electronic 'skimming' devices to steal credit- and debit-card information from

11

unsuspecting victims in Europe, uses that information to withdraw cash from banks in the United States, and then wires the stolen funds back to co-conspirators overseas." Compl. at ¶ 5.

On February 16, 2012, when FBI agents appeared at Defendant's apartment to arrest him, Defendant endangered not only the lives of several FBI agents and FDNY firefighters, but also the lives of all those residing in Defendant's apartment building, by setting fire to the apartment building in an attempt to escape from FBI agents. The dangerous situation occurred as follows:.

> [FBI] [a]gents knocked on [D]efendant's door, announced themselves as the police and indicated that they had an arrest warrant for [D]efendant. [D]efendant did not answer the door. [FBI] [a]gents continued to knock and announced themselves and, when no one came to the door, used a ramming device to attempt to open the door. Since there was a metal latch affixed to the door and the door jamb, [FBI] agents were only able to open the door several inches. Once the door was open several inches, [FBI] agents continued to yell that they had an arrest warrant and that any occupants of the apartment should open the door. No one from inside the apartment attempted to open the door. Shortly thereafter, [FBI] agents began to smell smoke coming into the hallway from [D]efendant's apartment. The smoke became visibly apparent in the hallways and the building's internal smoke alarm was triggered. As the smoke grew thicker, [FBI] agents called 911 to request the assistance of the [FDNY] *and evacuated the other residents of the building to safety.*

PSR at ¶ 22 (emphasis added); Tr. I at 29, 37, 40-44, 63, 74; Tr. II at 106.

Furthermore, numerous FBI agents testified about the dangerous conditions created by Defendant. For example, before the FBI agents at the front door began using a ramming device, Special Agent Mathew Nahas, who was stationed at the rear of Defendant's apartment, testified he saw a light on in Defendant's bedroom. Tr. II at 107. After the agents began knocking, but before the smoke was observed, Special Agent Nahas testified he "heard what [he] took to be a banging sound, something being smashed against something else, coming from inside of the apartment." Tr. II at 108; *see also* PSR at ¶ 23. Subsequently, as the ram was striking the front door, Special Agent Nahas testified he saw Defendant stand at the bedroom window and then retreat into the apartment and move into the living room. Tr. II at 108-09, 126; *see also* PSR at ¶

23. Following his observation of a figure in the living room, Special Agent Nahas observed flickering fire light on the back wall of the apartment complex through the living room window. Tr. II at 109. Special Agent Nahas then observed a woman's face over the window sill of the bedroom window. Tr. II at 109-10. After the apartment began filling with black smoke, Special Agent Nahas observed Defendant open a back window, but when Special Agent Nahas identified himself as law enforcement, Defendant retreated into the apartment. Tr. II at 110.

After FDNY firefighters cut through the latch locking Defendant's door, FBI agents arrested Defendant and his girlfriend in Defendant's apartment. PSR at ¶ 24; Tr. I at 43-44, 49. Special Agent Stacy Nimmo testified the smoke was so thick when agents entered the apartment that she could only see a few inches in front of her, and that the FDNY gave the FBI agents a heat-sensing camera so they would be able to see. Tr. I at 44. At the time of Defendant's arrest, his right hand was cut and bleeding. Tr. I at 52; Tr. II at 111.

A search of Defendant's apartment not only revealed that Defendant purposefully set fire to the apartment, but that Defendant's apartment was filled with materials to support his criminal activities. When FDNY Fire Marshall Michael Jankowski conducted an examination of Defendant's bathroom, he testified the fire originated in a cardboard box located in the middle of the bathroom floor, not on the rug below the cardboard box, as portions of the rug were undamaged. Tr. IV at 14-16, 23; PSR at ¶ 25. He also opined that, on the basis of his examination of the bathroom and its physical contents only, the fire did not start as a result of an accident; there was no evidence of common accidental sources of fire, such as a candle, a cigarette, a curling iron that had been plugged in, or an electrical problem in the walls or ceiling. Tr. IV at 24-26, 29, 33; PSR at ¶ 25.

When members of the FBI Evidence Recovery Team conducted a search of Defendant's apartment, they recovered various pieces of electronic and plastic equipment that are commonly used to conduct skimming activities, *i.e.*, activities through which criminals obtain credit and debit account information from victims who use ATM machines. PSR at ¶ 26 & n.1. "Many of those items appeared to have been purposefully tampered with, hidden, smashed[,] or burned in an attempt to destroy those items." PSR at ¶ 26.

> For example, on the floor of the bedroom, agents found various pieces of a laptop computer that appeared to have been hastily ripped apart at the screen and smashed. The corner of the dresser appeared to have been damaged by a blunt object that had been hit against it, and blood stains were visible on the front of the dresser. A forensic examination of the laptop computer revealed the presence of [D]efendant's blood. The cabinet beneath the kitchen sink was also covered with blood. Inside that cabinet, agents found a trash can that contained a broken hard drive and a piece of electronic wiring commonly used as a component of a skimming device. Inside the oven, agents discovered another hard drive that also appeared to be smashed. In the living room, agents recovered various additional pieces of electronic components, including power cords, batteries[,] and two pairs of spy glasses. The spy glasses were found within eyeglass cases; inside one of those eyeglass cases agents also discovered card readers, or devices that can be used to read and store data from the magnetic stripe of a credit or debit card. In the living room closet, agents recovered more electronic components, including a box of pin-hole cameras, multiple pieces of plastic molding commonly used to mount skimming devices onto ATM machines[,] and various tools used to construct skimming equipment, including drill bits, molding tools[,] and quick-setting epoxy glue.

> In the bathroom, where the fire originated, agents recovered the charred remnants of various additional pieces of electronic equipment and plastic molding, including three devices constructed to replicate the card reader of an ATM machine. Those devices also included components designed to read and store victims' credit card information when the debit or credit card passes through the phony card reader. Agents also recovered a cellular telephone from the bathroom trash can and a cigarette lighter from the bathtub. A forensic examination of the lighter revealed the presence of two DNA types, that of [D]efendant and his girlfriend.

PSR at ¶¶ 27-28; *see also* Tr. II at 122-23, 125, 131-33, 140-44, 148-49, 154-55. Special Agent Sara Poole testified that FBI agents with the Evidence Recovery Team recovered seven cell

phones and two thumb drives from the living room, a burned card reader from the ledge of the bathtub, and a burned cell phone from the bathroom trash can in Defendant's apartment in addition to the hard drive from Defendant's oven and the hard drive in the trash can. Tr. II at 176-81, 184-88. Special Agent Judith Cutler testified the Evidence Recovery Team also found over $6,000.00 in cash in Defendant's apartment, as well as a Trump One Card in Defendant's wallet in the name Raul Caba. Tr. II at 213, 215. Further, Special Agent Martha Berdote testified the Evidence Recovery Team recovered four cell phones and a hard drive from Defendant's bedroom in addition to the damaged laptop computer. Tr. III at 402-03, 406.

Special Agent Poole and Special Agent Judith Cutler both testified law enforcement agents recovered a digital photo frame from Defendant's apartment. Tr. II at 181-82, 209. Special Agent Nahas later removed a passport and driver's license from inside that digital photo frame, which was different from the digital photo frame that had been in the box searched by the FBI. Tr. II at 127; Tr. V at 547-58. Both the passport and driver's license had Defendant's photo on them but bore the name Imre Makara. Tr. II at 128-29.

Joselito Jimbo, a construction worker who was hired to work on Defendant's apartment after the fire, also stated he found a passport and another identification document hidden under the radiator cover in Defendant's bedroom. Tr. IV at 68-70. Mr. Biancaniello, Defendant's landlord, confirmed that Mr. Jimbo had told him that he had found a passport hidden behind the radiator in Defendant's apartment. Tr. IV at 90-91. Mr. Biancaniello testified he retrieved the passport, and testified the passport had Defendant's picture but was in the name Raul Caba. Tr. IV at 93.

United States Secret Service Special Agent Christian Wilson testified extensively about skimming devices and the complexities of creating a successful skimming device. Tr. III at 317-

31After reviewing some of the evidence collected from Defendant's apartment, Special Agent Wilson testified that, in his expert opinion, the evidence, such as a multiple PIN pad overlays specifically tailored to different types of ATMs, credit card magnetic strip scanning overlays, and small cameras to place over PIN pads, consisted of skimming equipment. Tr. III at 332-36, 341-44, 348-51, 353-55, 363-65. Special Agent Wilson also testified certain of the photos found in Defendant's apartment depicted either skimming equipment or ATMs for skimming equipment to copy, which suggested to Special Agent Wilson that Defendant was constructing and selling skimming equipment to other people. Tr. III at 336-37, 345, 365-66.

On the basis of Defendant's testimony as well as on the basis of the Government's evidence and the testimony of Special Agent Wilson, the Court finds "there is a preponderance of the evidence that [D]efendant was engaged . . . in credit card fraud activity." PSR at ¶ 66. Since this conduct cannot be factored into Defendant's guideline calculations as it is unrelated to the Counts charged, the Court considers the information as an aggravating circumstance that constitutes grounds for a substantial upward departure. *See* II.5.f., *infra*; *see also* U.S. Sentencing Guidelines Manual § 5K2.0 (U.S. Sentencing Comm'n 2012); PSR at ¶ 104.

While the Court recognizes Defendant's honesty in admitting possession of the false passports and the skimming equipment, these small admissions are grossly outweighed by Defendant's long criminal history, his widespread and sophisticated identity theft and fraud scheme, his use of fire to try to cover up his criminal scheme, his extensive perjury at trial, and the danger in which he placed his girlfriend and all the other occupants of his apartment building when he committed arson at 6:00 A.M. while everyone in the apartment complex was likely to be asleep.

Accordingly, on balance, the nature and circumstances of the offense weigh in favor of a significant incarcerative sentence.

## 2. The Need for the Sentence Imposed

The second 18 U.S.C. § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). The Court will address each subsection in turn.

### a. Reflecting the Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment

The Court finds a significant sentence is necessary to accomplish the purposes of reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

Defendant's crime is an incredibly serious one: he set fire to an apartment building at 6:00 A.M. to cover up and destroy evidence of his international credit and debit card fraud operation. *See United States v. Vega*, 94-CR-729, 2008 WL 2323371, at *3 (E.D.N.Y. June 2, 2008) (Sifton, J.) (noting arson is a serious crime, especially when committed in conjunction with other crimes). In doing so, he placed his sleeping girlfriend, the tenants of the twenty other apartments in his building, and the agents outside his door, as well as the imminently arriving firefighters, in grave danger of serious injury and death. *See* U.S. Sentencing Guidelines Manual § 2K1.4 cmt. risk of death and serious bodily injury (U.S. Sentencing Comm'n 2012) (noting

setting a fire creates a risk to firefighters). Defendant further increased the danger to all in the building and displayed utter disrespect for the laws of this country by refusing to let law enforcement officers and firefighters into his apartment after the fire had started. Dkt. 86 ("Gov't Letter") at 3. In choosing to risk the lives of others in an effort to cover up his already serious crimes, Defendant not only committed a dangerous crime, but his actions also showed a complete disrespect for the law and the lives of numerous individuals. Only a significant prison term can provide just punishment for such a callous act.

### b. Affording Adequate Deterrence to Criminal Conduct

"Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." *Davis*, 2010 WL 1221709 at *2. The Court finds a significant incarcerative sentence is also necessary to afford adequate deterrence, both specific and general, to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B).

Regarding specific deterrence, Defendant is a career criminal who: (1) has been convicted in Italy in absentia for credit card fraud of a complex and international nature; (2) is the subject of two outstanding Interpol warrants on the basis of intelligence from Romania and Italy; (3) has sufficient ties to the criminal world to have easy access to false identity documents; (4) has evidenced little difficulty or hesitation in slipping across numerous international borders, including this country's southern border; and (5) is willing to risk the life and limb of others for a chance at maintaining his own freedom. Defendant's continued criminal activity after being convicted in absentia in Italy and the subject of two Interpol arrest warrants indicates he is in need of lengthy incapacitation to achieve specific deterrence. *See United States v. Park*, 758 F.3d 193, 201 (2d Cir. 2014) (noting particular need for incapacitation and specific deterrence given defendant's continued criminal activity after prior convictions).

Further, "[t]o permit such an offender to avoid meaningful incarceration, while jailing thieves and other non-violent offenders of lower social status, would trivialize the seriousness of white-collar [and white-collar-derivative] offenses." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.). Defendant is a sophisticated and educated individual. Defendant could have used his skills in a productive manner. He chose not to and in doing so demonstrated a blatant disregard for both the victims of his fraud and the victims of his arson. He must be deterred from doing so again through incapacitation. "A substantial sentence is required because this is a white collar[-derivative] crime by a highly intelligent and competent defendant who [may be] capable of being deterred." *United States v. Joffe*, 08-CR-206, 2010 WL 2541667, at *2 (E.D.N.Y. June 4, 2010) (Weinstein, J.).

Regarding general deterrence, the Second Circuit has noted the appropriateness of significant sentences for those who feel white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013). "Persons who commit white-collar crimes like [D]efendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of punishments that may be imposed. A serious sentence is required to discourage such crimes." *United States v. Stein*, 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) (Weinstein, J.); *see also United States v. Marsh*, 10-CR-480, 10-CR-697, 10-CR-700, 10-CR-800, 10-CR-801, 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) (Weinstein, J.) (noting people "choose to engage in white-collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished").

Here, Defendant used high-level electrical skills and his education to engage in a sophisticated, wide-spread, and difficult to trace white-collar scheme to steal debit and credit card information from unsuspecting victims. Rather than acquiescing to arrest pursuant to a

warrant, Defendant then committed a subsequent crime by setting fire to his apartment where countless individuals reside in attempt to cover up his other crimes and destroy evidence. A high-sentence is both "necessary to deter other skimmers and cyber criminals who, like [D]efendant, are in a position to choose between a law-abiding life and a life of crime" as well as necessary to deter others from engaging in arson in an effort to obstruct justice and destroy evidence. Dkt. 68 ("Govt's Sentencing Memo") at 11.

### c. Protecting the Public from Further Crimes of the Defendant

As noted above, Defendant is an international career criminal whose offenses have escalated from fraud to arson in service of his fraud. The only way to protect the public from Defendant committing further crimes is to incapacitate Defendant. Because Defendant will become a threat to the public as soon as he is released, a significant sentence is the only way to ensure the continued safety of the public from any further crimes Defendant may commit.

### d. Providing Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

Defendant does not require additional educational or vocational training, medical care, or other correctional treatment. Accordingly, this factor is irrelevant.

### 3. The Kinds of Sentences Available

The third 18 U.S.C. § 3553(a) factor requires the Court to discuss "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant was found guilty of use of arson to commit obstruction of justice and/or destruction of evidence in violation of 18 U.S.C. § 844(h)(1) under Count Three of the Second Superseding Indictment. This Count carries a mandatory ten-year term of incarceration. 18

U.S.C. § 844(h)(1); U.S. Sentencing Guidelines Manual § 2K2.4(b) (U.S. Sentencing Comm'n 2012). Defendant was also found guilty of use of fire to damage real and personal property in violation of 18 U.S.C. § 844(i) under Count Four of the Second Superseding Indictment. This Count carries a minimum term of imprisonment of five years. 18 U.S.C. § 844(i).

Accordingly, the only kind of sentence available to Defendant is incarceration – the minimum term of which is fifteen years or one hundred eighty months.

### 4. The Kinds of Sentence and the Sentencing Range Established For Defendant's Offenses

The fourth 18 U.S.C. § 3553(a) factor requires the Court to detail "the kinds of sentence and the sentencing range established for[] the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced[.]" 18 U.S.C. § 3553(a)(4)(A). The Court will address the Guidelines ranges for each of the five counts independently before analyzing the application of the multiple count adjustment.

#### a. Counts One and Two: Obstruction of Justice and Destruction of Evidence

Because Counts One and Two are closely related, the Court will treat the Counts together for purposes of calculating a guideline range. *See* PSR at ¶ 32.

Both Counts One and Two carry a minimum term of no imprisonment and a maximum term of imprisonment of twenty years. 18 U.S.C. §§ 1512(c)(1), 1519.

Defendant has a base offense level of fourteen for Counts One and Two pursuant to Guideline 2J1.2(a), which mandates a base level offense of fourteen for all Obstruction of Justice offenses. U.S. Sentencing Guidelines Manual § 2J1.2(a) (U.S. Sentencing Comm'n 2012). Defendant destroyed and attempted to destroy specific evidence that was material to the investigation of his skimming crimes. The Sentencing Commission has approved a two-level enhancement if the obstruction of justice offense involves "the selection of any essential or especially probative record, document, or tangible object, to destroy or alter" pursuant to Guideline 2J1.2(b)(3)(A). U.S. Sentencing Guidelines Manual § 2J1.2(b)(3)(A) (U.S. Sentencing Comm'n 2012); *see also* PSR at ¶ 34. This enhancement indicates a serious concern about obstructionist activities that ought to be reflected in the Court's sentence for Defendant. Defendant also received a two-level enhancement for obstructing or impeding the administration of justice as a result of his perjured testimony at trial pursuant to Guideline 3C1.1. U.S. Sentencing Guidelines Manual § 3C1.1 (U.S. Sentencing Comm'n 2012); *see also* PSR at ¶¶ 33-34; PSR Addendum at 2-3. Specifically, Defendant committed numerous instances of perjury during his testimony, in contravention to Guideline 3C1.1 application noted 4(B). U.S. Sentencing Guidelines Manual § 3C1.1 application note 4(B) (U.S. Sentencing Comm'n 2012).

Accordingly, with these enhancements, Defendant's adjusted offense level for Counts One and Two is eighteen. With a Criminal History Category of I, Defendant's Guidelines Sentencing Range for Counts One and Two is a term of imprisonment between twenty-seven to thirty three months. *See* U.S. Sentencing Guidelines Manual Sentencing Table (U.S. Sentencing Comm'n 2012).

### b. Count Three: Use of Arson to Commit Count One and/ or Two

Guideline 2K2.4(a), which governs arson and property damage by use of fire offenses, states the guideline sentence for a 18 U.S.C. § 844(h) offense is "the term of imprisonment required by statute." U.S. Sentencing Guidelines Manual § 2K2.4(b) (U.S. Sentencing Comm'n 2012); *see also* PSR at ¶ 39. The stated term of imprisonment under 18 U.S.C. § 844(h)(1) for a first offense of use of fire or an explosive to commit a felony is ten years to run consecutively with any other term of imprisonment. 18 U.S.C. § 844(h).

Accordingly, Defendant must serve a term of ten years of imprisonment for Count Three, to be followed consecutively by his sentence on Counts One, Two, Four, and Five.

### c. Count Four: Use of Fire to Damage Real and Personal Property

Count Four carries a minimum imprisonment term of five years and a maximum imprisonment term of twenty years. 18 U.S.C. § 844(i).

Guideline 2K1.4(a)(1)(A), which governs arson and property damage by use of fire offenses, provides for a base offense level of twenty-four where the offense creates a substantial risk of death or serious bodily injury to any person other than a participant in the offense and that risk was created knowingly. U.S. Sentencing Guidelines Manual § 2K1.4(a)(1)(A) (U.S. Sentencing Comm'n 2012); *see also* PSR Addendum at 3. Defendant set fire to his apartment, which was on the second floor of a five-story, 21-apartment building, in an attempt to destroy incriminating evidence against him, and "his actions created a risk of serious bodily injury to law enforcement officials, his girlfriend who was inside his apartment[,] and the other tenants in his apartment complex." PSR Addendum at 3; *see also* Tr. IV at 78. A two-level upward adjustment is warranted pursuant to Guideline 2K1.4(b)(1) because Defendant committed this

use of fire offense in an effort to conceal another offense, namely, passport fraud and debit and credit card fraud. U.S. Sentencing Guidelines Manual § 2K1.4(b)(1) (U.S. Sentencing Comm'n 2012); *see also* PSR at ¶ 41; PSR Addendum at 3. This enhancement indicates the Sentencing Commission's serious concern about using fire to cover up evidence of crimes, as any fire can rage out of control and damage property, injure other persons, or even kill innocent bystanders or firefighters. *See, e.g.*, U.S. Sentencing Guidelines Manual § 2K1.4 cmt. risk of death and serious bodily injury (U.S. Sentencing Comm'n 2012). A second two-level upward adjustment is warranted for obstructing or impeding the administration of justice as a result of his perjured testimony at trial pursuant to Guideline 3C1.1. U.S. Sentencing Guidelines Manual § 3C1.1 (U.S. Sentencing Comm'n 2012); *see also* PSR at ¶ 44; PSR Addendum at 3. Specifically, Defendant committed numerous instances of perjury during his testimony, in contravention to Guideline 3C1.1 application noted 4(B). U.S. Sentencing Guidelines Manual § 3C1.1 application note 4(B) (U.S. Sentencing Comm'n 2012).

Accordingly, Defendant's adjusted offense level for Count Four is twenty-eight which, with a Criminal History Category of I, results in a sentencing range of seventy-eight to ninety-seven months. *See* U.S. Sentencing Guidelines Manual Sentencing Table (U.S. Sentencing Comm'n 2012).

### d. Count Five: Use of False Passport

Count Five carries a minimum term of no imprisonment and a maximum term of imprisonment of ten years as this is Defendant's first false use of passport offense and the offense was not committed to facilitate an act of international terrorism or a drug trafficking crime. 18 U.S.C. § 1543.

Guideline 2L2.2(a), which governs use of false passport offenses, provides for a base offense level of eight (8). U.S. Sentencing Guidelines Manual § 2L2.2(a).(U.S. Sentencing Comm'n 2012). Guideline 2L2.2(b)(3)(B) provides for a two-level increase if the defendant fraudulently obtained or used a foreign passport. U.S. Sentencing Guidelines Manual § 2L2.2(b)(3)(B) (U.S. Sentencing Comm'n 2012). Defendant fraudulently obtained and used a Romanian passport in the name Raul Caba, a Romanian passport in the name Iulian Ichim, and a Hungarian passport in the name Makara Imre, which means the two-level increase pursuant to Guideline 2L2.2(b)(3)(B) is appropriate. *See, e.g.*, PSR ¶¶ 12, 21.

Accordingly, Defendant's adjusted offense level for Count Five is ten which, with a Criminal History Category of I, brings the sentencing range for this offense between six to twelve months imprisonment. *See* U.S. Sentencing Guidelines Manual Sentencing Table (U.S. Sentencing Comm'n 2012).

### e. Multiple Count Adjustment

Under Guideline 3D1.1(a), Counts One (Obstruction of Justice), Two (Destruction of Evidence), and Four (Use of Fire to Damage Real and Personal Property) are grouped as closely related since they involve "substantially the same harm." U.S. Sentencing Guidelines Manual § 3D1.1(a), 3D1.2 (U.S. Sentencing Comm'n 2012). Count Five (Use of False Passport) is not grouped as it represents unrelated offense conduct. Count Three is excluded from the multiple count adjustment analysis pursuant to Guideline 3D1.1(b)(1), which excludes any count for which the statute specifies a term of imprisonment to be imposed and requires that term of imprisonment be imposed to run consecutively to any other term of imprisonment imposed. U.S. Sentencing Guidelines Manual § 3D1.1(b)(1) (U.S. Sentencing Comm'n 2012).

After applying the multiple count adjustment analysis, Defendant's combined adjusted offense level for Counts One, Two, and Four is twenty-eight as it is the highest offense level of the counts in the group. U.S. Sentencing Guidelines Manual § 3D1.4(a) (U.S. Sentencing Comm'n 2012). Count Five, at an offense level of ten, is disregarded pursuant to Guideline 3D1.4(c) because ten is nine or more levels less serious than twenty-eight, the adjusted offense level of Counts One, Two, and Four. U.S. Sentencing Guidelines Manual § 3D1.4(c) (U.S. Sentencing Comm'n 2012).

The total calculated offense level for Counts One, Two, Four, and Five under the Guidelines, therefore, is twenty-eight which, with a Criminal History Category of I, means Defendant's sentencing range on these counts is seventy-eight to ninety-seven months. *See* U.S. Sentencing Guidelines Manual Sentencing Table (U.S. Sentencing Comm'n 2012).

Count Four also has a statutory minimum term of imprisonment of five years, so Defendant must be sentenced to at least sixty months on Counts One, Two, Four, and Five. 18 U.S.C. § 844(i); PSR at ¶ 92. In addition, any sentence imposed for Counts One, Two, Four, and Five must run consecutively with Defendant's ten-year sentence for Count Three. 18 U.S.C. § 844(h)(1); U.S. Sentencing Guidelines Manual § 2K2.4(b) (U.S. Sentencing Comm'n 2012).

Accordingly, because Defendant faces a mandatory term of imprisonment of ten years (one hundred and twenty months) under Count Three which must run consecutively to any other term if imprisonment imposed, and because Defendant faces a mandatory minimum term of imprisonment of five years (sixty months) under Count Four, Defendant's guidelines range of seventy-eight to ninety-seven months imprisonment for Counts One, Two, and Five is subsumed by the fifteen years (one-hundred and eighty months) Defendant must receive for Counts Three and Four. *See* Gov't Letter at 5. In addition, pursuant to Guidelines 5D1.1(b) and 5D1.2(a)(2), a

term of supervised release of at least two years but not more than three years is required. U.S. Sentencing Guidelines Manual § 5D1.1(b), 5D1.2(a)(2) (U.S. Sentencing Comm'n 2012); *see also* PSR at ¶ 95.

### 5. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth 18 U.S.C. § 3553(a) factor requires the Court to evaluate "any pertinent policy statement [] issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and [] that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(5). The Court will first address policy statements relevant to each of the five counts for which Defendant was found guilty before addressing the Sentencing Commission's policy of upwardly departing in cases involving aggravating circumstances.

#### a. Counts One and Two: Obstruction of Justice and Destruction of Evidence

In the United States Sentencing Commission's 2012 commentary on Obstruction of Justice offenses such as Counts One and Two, the Commission notes if "bodily injury or significant property damage resulted, an upward departure may be warranted." U.S. Sentencing Guidelines Manual § 2J1.2 cmt. upward departure considerations (U.S. Sentencing Comm'n 2012). Defendant's criminal behavior resulted in tens of thousands of dollars of damage to his apartment. *See* II.7, *infra*. Defendant also created a risk of bodily injury and death to his girlfriend, his neighbors, the FBI agents, and firefighters when he committed these Obstruction of Justice offenses using fire. Accordingly, the Court finds a significant sentence is warranted on Counts One and Two.

### b. Count Three: Use of Arson to Commit Count One and/ or Two

The Sentencing Commission defines arson as a "crime of violence." *See* U.S. Sentencing Guidelines Manual § 2L1.2 cmt. (1)(B)(iii) definition of "crime of violence", § 4B1.2(a)(2) (U.S. Sentencing Comm'n 2012). This suggests a longer incarcerative sentence for criminal defendants convicted of arson offences is seen as necessary to protect the public. Further, Count Three carries a mandatory ten-year consecutive sentence. *See* II.4.b., *supra*. The mandatory and consecutive nature of the sentence indicates a strong Congressional policy of punishing arson offenses separately from any other crime that a criminal defendant is found to have committed. *See* 18 U.S.C. § 844(h)(1). Similarly, the ten-year length indicates the seriousness with which Congress and the Sentencing Commission treat the commission of any arson offense, independent and apart from any crime charged in addition to the arson offense, as Counts One, Two, Four, and Five are here. Accordingly, the Court will impose the mandatory ten-year sentence on Count Three.

### c. Count Four: Use of Fire to Damage Real and Personal Property

There are many policy statements worth noting in regards to Count Four. As with arson, the use of fire to damage real and personal property falls under the Sentencing Commission's definition of a "crime of violence" because the crime is "punishable by imprisonment for a term exceeding one year" and "involves conduct that presents a serious potential risk of physical injury to another." *See* U.S. Sentencing Guidelines Manual § 4B1.2(a)(2) (U.S. Sentencing Comm'n 2012). Count Four carries a minimum term of imprisonment of five years and a maximum term of imprisonment of twenty years, which means it not only qualifies as a "crime

of violence" under the Guidelines, but also indicates the seriousness with which Congress viewed crimes of this nature. 18 U.S.C. § 844(i); PSR at ¶ 92.

In regards to this case specifically, Defendant received a base offense level of twenty four under Guideline 2K1.4(a)(1) because his offense created a substantial risk of death or serious bodily injury to any person other than Defendant, and Defendant created that risk knowingly. U.S. Sentencing Guidelines Manual § 2K1.4(a)(1) (U.S. Sentencing Comm'n 2012). Guideline 2K1.4(a)(1), however, also provides for a base offense level of twenty four if the offense "involved the . . . attempted destruction of a dwelling." U.S. Sentencing Guidelines Manual § 2K1.4(a)(1) (U.S. Sentencing Comm'n 2012). This indicates the Sentencing Commission viewed both knowingly creating a substantial risk or death or serious bodily injury and attempting to destroy a dwelling as equally deserving of severe punishment. Defendant would qualify for a base offense level of twenty four under both prongs as he *both* knowingly created a substantial risk or death or serious bodily injury *and* attempted to destroy a dwelling. In addition, the Commission notes in its 2012 commentary on Arson and Property Damages offenses that "[c]reating a substantial risk of death or serious bodily injury includes creating that risk to fire fighters and other emergency and law enforcement personnel who respond to or investigate an offense." U.S. Sentencing Guidelines Manual § 2K1.4 cmt. risk of death and serious bodily injury (U.S. Sentencing Comm'n 2012).

These provisions, and the serious policy concerns which motivate them, weigh in favor of a lengthy sentence for Defendant because: (1) Defendant testified his girlfriend was asleep in the bedroom at the time he started the fire; (2) Defendant set fire to his second-floor apartment in a five-story, 21-apartment building; (3) Defendant set fire to his apartment at 6:00 A.M. when he knew his neighbors were likely to be asleep; (4) Defendant set fire to his apartment because he

heard law enforcement officials outside his apartment door, thereby creating a risk to those law enforcement personnel; and (5) Defendant set fire to his apartment in an effort to conceal his other criminal activities and destroy evidence. PSR at ¶¶ 22-24, 29; Opp. to Bail at 2. Accordingly, the Court finds a substantial incarcerative sentence is warranted for Count Four.

### d. Count Five: Use of False Passport

The only policy statements from the Sentencing Commission regarding the use of false passport charge are irrelevant to Defendant's case, as Defendant did not obtain or use a United States passport for the purpose of entering the United States to engage in terrorist activity. U.S. Sentencing Guidelines Manual § 2L2.2 cmt. upward departure provision (U.S. Sentencing Comm'n 2012). Accordingly, there are no pertinent policy statements for Count Five.

### e. Multiple Count Adjustment

In the PSR, Counts One, Two, and Four are included in a multiple-count adjustment analysis. PSR at ¶ 52. The Sentencing Commission has explained that the multiple count adjustment is meant "to prevent multiple punishment for substantially identical offense conduct." U.S. Sentencing Guidelines Manual § 3D1.1 Introductory Commentary (U.S. Sentencing Comm'n 2012). "Convictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct that is not otherwise accounted for by the guidelines." U.S. Sentencing Guidelines Manual § 3D1.1 Introductory Commentary (U.S. Sentencing Comm'n 2012).

In a similar vein, and as the Government notes in its sentencing memorandum, the severity of Defendant's punishment under Counts Three and Four is motivated by the same fact -- Congress's justifiable view that the use of fire is especially dangerous and deserving of severe

punishment. Gov't Letter at 6. Counts Three and Four, while separate offenses for the purposes of the Double Jeopardy Clause as each requires proof of an element the other does not, nonetheless subject Defendant to mandatory minimum terms of imprisonment on the basis of similar underlying facts and on the basis of Congress's desire to dissuade criminal defendants from using fire. *Id.*; *see also Blockburger v. United States*, 284 U.S. 299 (1932).

Accordingly, the Court considers the serious charges in Counts One, Two, and Four together in fashioning a sentence. The Court also notes that Count Four carries a minimum imprisonment term of five years and that all three charges carry a maximum imprisonment term of twenty years. 18 U.S.C. §§ 1512(c)(1), 1519, 844(i). Lastly, the Court considers with care the similar Congressional motivations behind the severity of the sentences under Counts Three and Four in determining an appropriate sentence in this case.

## 6. The Need to Avoid Unwarranted Sentence Disparities

The sixth 18 U.S.C. § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Under 18 U.S.C. § 844(h)(1), Defendant must serve a ten-year sentence for his conviction under Court Three for Arson consecutively to his sentence on all other Counts because he committed the arson in order to commit the felonies charged in Counts One and Two, Obstruction of Justice and Destruction of Evidence, respectively. 18 U.S.C. § 844(h)(1).

Under 18 U.S.C. § 844(i), the provision which Defendant was convicted of violating in Count Four, an individual engaging in the same conduct as Defendant may be separately punished by a term of imprisonment no less than five years and as long as twenty years. 18 U.S.C. § 844(i) states "[w]hoever maliciously damages . . . by means of a fire . . . any building,

vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than [five] years and not more than [twenty] years[.]" 18 U.S.C. § 844(i). Here, Defendant set fire to a building which had a commercial retail space on the first floor. *See* Tr. II at 103, Tr. IV at 74. A sentence up to twenty years' imprisonment therefore would not be beyond the pale for Defendant's crime under Count Four alone.

In addition, "[t]he New York state [arson] statute, while not directly applicable, provides a useful indication of how this crime would be treated" under state law. *United States v. Ferranti*, 928 F. Supp. 206, 214 (E.D.N.Y. 1996) (Weinstein, J.). Defendant's crime would be characterized as Arson in the Second Degree under New York Penal Law § 150.15, which reads:

> A person is guilty of arson in the second degree when he intentionally damages a building or motor vehicle by starting a fire, and when (a) another person who is not a participant in the crime is present in such building or motor vehicle at the time, and (b) the defendant knows that fact or the circumstances are such as to render the presence of such a person therein a reasonable possibility.

N.Y. Penal Law § 150.15. In Defendant's case, Defendant's crime meets the definition of Arson in the Second Degree under New York law because Defendant knew his girlfriend was present in his apartment, knew the FBI agents were present outside of his front door, and the fire being set at 6:00 A.M. renders the presence of other tenants in the building a reasonable possibility. Arson in the second degree is a class B felony in New York requiring a determinate term with a minimum of five years and a maximum of twenty-five years' incarceration. N.Y. Penal Law § 70.02(3)(a).

Further, "[a]rson of an occupied house is punished severely because, in burning a dwelling, [D]efendant manifests a contempt for human life[.]" *Ferranti*, 928 F. Supp. at 214 (internal quotation marks and citation omitted). Traditionally, the crime was a capital offense.

*Id.* (citation omitted). In addition, "[a]rsons in New York City are particularly dangerous [and] represent one of the greatest hazards to the wellbeing of those who reside, work, or visit here." *Id.* at 215-16 (internal citations omitted).

Here, Defendant's crime was particularly condemnable. "Even though [D]efendant may not have specifically intended to [injure or] kill a tenant[, an agent,] or a firefighter, he is not relieved of responsibility for the inherently dangerous nature of his crime." *Id.* at 215 (internal citation omitted). Further, "[t]he aggravating elements present in the instant case that would warrant the highest condemnation under a wide variety of statutes include: the building being a habitable structure; a person being present at the time of burning; . . . [D]efendant having reason to believe that [more than one] person was present at the time of the burning, a firefighter being subject to substantial risk of bodily injury; the offense occurring [early in the morning];" and scheming to obstruct justice and destroy evidence of his extensive skimming activities and complex skimming scheme. *Id.* at 215 (citation omitted).

Accordingly, a substantial sentence would avoid disparities with New York State sentences and other federal sentences which recognize the severity of Arson and Use of Fire to Damage Real and Personal Property, much less the compounded severity of these crimes when committed in conjunction with Obstruction of Justice and Destruction of Evidence in relation to both Use of False Passports and the investigation of an international debit and credit card fraud scheme.

## 7. The Need to Provide Restitution

Lastly, the seventh 18 U.S.C. § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

18 U.S.C. § 3663A(a)(1) provides "the court shall order . . . that the defendant make restitution to the victim of the offense" when a defendant is charged with, among other things, an offense against property. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). Defendant was convicted of using fire to damage real and personal property in Count Four, which constitutes an offense against property under 18 U.S.C. § 3663A(c)(1)(A)(ii). Restitution, therefore, may be applicable in Defendant's case.

In determining whether to order restitution, the Court must consider "the amount of loss sustained by each victim as a result of the offense" and "the financial resources of the defendant, the financial needs and earning ability to the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i).

Guideline 5E1.1(a)(1) further provides the Court shall enter restitution for the full amount of an identifiable victim's or victims' loss, and Guideline 5E1.1(e) states the Court may order Defendant to pay the full amount of restitution in a lump sum. U.S. Sentencing Guidelines Manual § 5E1.1(a)(1) & (e) (U.S. Sentencing Comm'n 2012).

Mr. Biancaniello, the owner of the apartment building that Defendant set on fire, received an estimate of $67,361.42 from his insurer, State Farm, as the total replacement and repair cost incurred as a result of Defendant's destruction of his apartment. Govt's Sentencing Memo at 14. Defendant seems to have the financial resources to pay the restitution amount irrespective of his incarceration. While Defendant testified he never worked in the United States, he also testified he had enough money to rent the damaged apartment for $1,900.00 a month, to go on vacation to Trump One, and to have "a bunch of Louis Vuitton boxes around [his] apartment." Tr. V at 552-53. Moreover, Defendant was also able to send thousands of dollars to friends in foreign countries. Lastly, Defendant has no dependents.

The Court therefore finds there is both a need to provide restitution to State Farm, which suffered a documented and identifiable loss as a result of Defendant's criminal behavior, and that such restitution should and can be paid by Defendant. Accordingly, restitution in the amount of $67,361.42 to State Farm is appropriate.

## CONCLUSION

There is good news and there is bad news. The good news is Keyser Soze is a myth. The bad news is Defendant is not. He constitutes an all too real clear and present danger to the public due to his engagement in arson, his international scheme of debit and credit card fraud, his possession of multiple false passports and identity documents, his total lack of remorse, his lack of respect for the United States Government and the laws of the United States, and his perjured testimony about his crimes. A sentence of one hundred and eighty (180) months of incarceration, to be followed by three (3) years of supervised release, with restitution in the amount of $67,361.42 and the $500.00 mandatory assessment fee, is appropriate and comports with the dictates of Section 3553. This sentence is consistent with, and sufficient but no greater than necessary to accomplish the purposes of 18 U.S.C. § 3553(a)(2).

The Court expressly adopts the factual findings of the Presentence Investigation Report and the Addendum to the Presentence Investigation Report.

SO ORDERED.

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: September 29, 2015
Brooklyn, New York